**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

WOODROW FLEMMING

                Plaintiff,

      v.                                                     No. 09-CV-1185
                                  (TJM/DRH)

DEBBIE KEMP; JEFFREY HYDE; GEORGE
WATERSON; CORRECTIONAL OFFICER
JOHN A. TATRO; CORRECTIONAL
OFFICER DARRIN C. CARRIGEUX;
CORRECTIONAL OFFICER TODD C.
MANLEY; LEO PALMER; CORRECTIONAL
OFFICER WAYNE I. PALMER;
CORRECTIONAL OFFICER KEVIN EDDY;
CORRECTIONAL OFFICER JERRY J.
HERBERT; and TERRY JAMES,

                Defendants.

_____

**APPEARANCES:**                              **OF COUNSEL:**

WOODROW FLEMMING
Plaintiff Pro Se
03-A-5259
Upstate Correctional Facility
Post Office Box 2001
Malone, New York 12953

HON. ERIC T. SCHNEIDERMAN              AARON M. BALDWIN, ESQ.
New York State Attorney General           Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, New York 12224

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

                     **REPORT-RECOMMENDATION AND ORDER**[1]

_____

      [1]This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Plaintiff pro se Woodrow Flemming ("Flemming"), an inmate in the custody of the New York State Department of Correctional and Community Services ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that eleven DOCS employees[2] violated his constitutional rights under the First, Fourth, Eighth, and Fourteenth Amendments.  Second Am. Compl. (Dkt. No. 9).  Presently pending are defendants' motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) or summary judgment pursuant to Fed. R. Civ. P. 56[3] and Flemming's cross motion for summary judgment, also pursuant to Fed. R. Civ. P. 56.  Dkt Nos. 178, 179, 183.[4]  Both motions are opposed.  Dkt. Nos. 183, 186, 191, 192, 193.  For the following reasons, it is recommended that defendants' motion be granted and Flemming's cross motion be denied.

## I.  Background

The facts are related herein in the light most favorable to Flemming as the non-moving party.  See Sheppard v. Beerman, 18 F.3d 147, 150 (2d Cir.1994).

### A.  Procedural History

On August 14, 2008, Flemming filed this action in the Western District of New York,

---

[2]Six other defendants were previ0usly dismissed.  Dkt. No. 10.

[3]The motion is made on behalf of all remaining defendants except Eddy, who has never been served with process or otherwise appeared in this case. See Dkt. Nos. 13, 15, 58 (at p.3), 170 (at p.7).  This action should be dismissed without prejudice as to Eddy in accordance with Fed. R. Civ. P. 4(m) (requiring completion of service upon a defendant within 120 days).

[4] As defendants have submitted materials beyond the face of the pleadings, it will be construed as a motion for summary judgment.

2

naming 122 defendants for alleged violations of his First, Fourth, Sixth, Eighth, and

Fourteenth Amendment rights.  Dkt. No. 1.  In an order dated December 10, 2008, the

Western District concluded that Flemming's complaint failed to state a cause of action, but

allowed him an opportunity to file an amended complaint and replead the action before

dismissing the case.  Dkt. No. 5.

On July 5, 2008, Flemming filed an amended complaint, naming 113 defendants for

substantially similar violations under the First, Fourth, Sixth, Eighth, and Fourteenth

Amendments.  First Am. Compl. (Dkt. No. 6).  Flemming contended that (1) the general

conditions he was exposed to in the Special Housing Unit ("SHU")[5] were unconstitutional

(Id., ¶¶ 27, 28, 33, 36, 42-44); (2) provision of a restricted diet of loaf and cabbage was

against his Eighth Amendment rights (Id., ¶¶ 28, 60); (3) disciplinary hearings were

conducted improperly leading to wrongful deprivations of privileges and good time credits

(Id., ¶¶ 30, 52); (4) he was never provided with a rule book (Id., ¶ 56); (5) the general

conditions of confinement were below constitutional standards (Id., ¶ 31); (6) defendants

conspired and retaliated against him for filing grievances and lawsuits (Id., ¶¶ 32, 37-38, 59,

62); (7) being housed in SHU while on a medical machine was unconstitutional (Id., ¶ 33);

(8) denial of his cane and wheelchair were in contravention of the Eighth Amendment (Id., ¶

36); (9) transfer from the Regional Medical Unit to Upstate SHU[6] was retaliatory (Id., ¶¶ 38,

---

[5]SHUs exist in all maximum and certain medium security facilities.  The units
"consist of single-occupancy cells grouped so as to provide separation from the general
population . . . ."  N.Y. Comp. Codes R. & Regs. tit. 7, § 300.2(b).  Inmates are confined in
a SHU as discipline, pending resolution of misconduct charges, for administrative or
security reasons, or in other circumstances as required.  Id. at pt. 301.

[6] "Upstate is a maximum security correctional facility comprised exclusively of . . .
SHU . . . cells in which inmates are confined, generally, for twenty three hours each day to

40, 70); (10) he was subjected to chemical agents and a use of force on September 5, 2005 which were both in violation of his Eighth Amendment rights (Id., ¶¶ 41, 62, 70, 72); (11) he was the victim of a sexual assault (Id., ¶ 55); and (12) his legal work was seized which interfered with his constitutional right to access the courts (Id., ¶ 58).

Pursuant to an Order dated March 31, 2009, the Western District ruled that "[a]ll of [Flemming's] claims **except** the claim regarding the September 5, 2005 cell extraction allegedly involving use of a chemical agent are dismissed with prejudice." Dkt. No. 8 at 7-8 (emphasis in the original). Moreover, Flemming was "advised that an amended complaint is intended to **completely replace** the prior complaint . . . and thus . . . renders any prior complaint of no legal effect." Id. at 8 (internal quotation marks and citations omitted) (emphasis in the original). Lastly, Flemming was "granted leave to file a Second Amended Complaint regarding **only** his claims of excessive force during the cell extraction . . . on September 5, 2005." Id. at 9 (emphasis in the original). Further amendment of the additional First, Fourth, Eighth, and Fourteenth Amendment claims were determined futile since Flemming continued to proffer vague and conclusory allegations which failed to state a claim, despite a prior opportunity to amend his complaint, as well as due process claims and events occurring prior to August 19, 2005 being time barred and due process claims being uncognizable. Id. at 3-6. The court specifically held that Flemming's subsequent proposed amended complaint would be limited only to the "circumstances surrounding the cell extraction and who [Flemming] intends to hold liable . . . .," (Id. at 8) dismissing with prejudice any other claims Flemming previously asserted. Id. at 6-9.

---

serve out lengthy disciplinary confinements for serious violations of prison rules." Hyde Decl. (Dkt. No. 178-3) ¶ 5.

Flemming filed a Second Amended Complaint, naming the present defendants, on April 6, 2009.  Second Am. Compl.  Similar to the complaints filed before it, Flemming contends that he was subjected to chemical agents as well as excessive force in violation of his Eighth Amendment rights.  Second Am. Compl. at 7-9.  Flemming also asserted claims of retaliation, complaints about his conditions of confinement, complaints about the conditions of SHU including deprivation of his medical machine, deprivation of privileges, and placement on a restricted diet, unconstitutional searches and seizures, and defective prison disciplinary procedures and hearings.  Id. at 8-10, 12-13, 15.  By Order dated June 12, 2009, the Western District dismissed the claims against the supervisory defendants and directed service.  Dkt. No. 10 at 5-6.  In an order dated September 21, 2009, the Western District transferred the case to the Northern District.  Dkt. No. 18.


### B.  September 5, 2005[7]

Flemming suffers from glaucoma for which he took daily eye drops.  Waterson Decl. (Dkt. No. 178-4) ¶ 6; Flemming Dep. (Dkt. No. 178-21) at 15-16.  "The policy at Upstate at the time was not to allow eye drop vials and dispensers to be kept in cells as they were increasingly used for purposes of committing aggravated harassments and unhygienic acts toward staff such as spraying or throwing or urine and other liquid substances."  Waterson Decl. ¶ 7.  Flemming was informed of this policy on September 1, 2005 and provision of his eye drops was "made one-on-one administered (as opposed to self-carry and allowed to be

---

[7] The submissions of both Flemming and defendants include multiple copies of identical papers dealing with the use of force report, unusual incident report, inmate injury report, subsequent photographs, disciplinary transcripts, and medical health records.  For ease and efficiency, citation will be made to the documents from defendants' submissions.

retained in cell) . . . . "  Waterson Decl. ¶ 8; see also Dkt. No. 179 at 6.  Flemming provided

his eye drops to security staff as required.  Waterson Decl. ¶ 8.

At approximately 6:45 a.m. on September 5, 2005, defendant nurse practitioner

Waterson approached Flemming's cell and requested return of his eye drops which had

been given to him during the morning medication round.  Waterson Decl. ¶ 9; DVD 1 at

6:42[8].  Waterson repeatedly requested return of the eye dropper, as it was no longer

allowed to be retained in Flemming's cell, but Flemming refused and became

argumentative.  Waterson Decl. ¶ 9; Dkt. No. 179 at 9; DVD 1 at 6:42.  Defendant Eddy,

who was accompanying Waterson on rounds, also approached the window and

unsuccessfully ordered the return of the eye dropper.  Waterson Decl. ¶ 10; DVD 1 at 6:42-

43 (showing exchange between Eddy explaining that all medical wants was the eye dropper

back and that Flemming needed to follow a direct order, and Flemming, who was

continually refusing).  This became the basis of a misbehavior report, authored by Eddy,

which charged Flemming with failing to follow direct orders and breaking medical and

property protocols.  Waterson Decl. ¶¶ 11-13.  Eddy then notified defendant Sgt. Hyde

about the problem.  Hyde Decl. (Dkt. No. 178-3) ¶ 15.  Hyde visited Flemming at his cell at

approximately 8:44 a.m., again seeking the return of the eye dropper.  Hyde Decl. ¶ 15.

Hyde "instructed [Flemming] repeatedly to either hand over the medications or prepare to

exit [the] cell for a search [and] . . . Flemming continue to refuse . . . and became

increasingly argumentative."  Hyde Decl. ¶ 15.

Refusal to follow orders and interference with staff cannot be

---

[8] A videotape (hereinafter "VHS") and two DVDs were traditionally filed with the
Court with defendants' motion.  Dkt. No. 178-5.

> tolerated within a maximum security facility as they constitute a
> threat to safety and security . . . Nor can retention of unauthorized
> items be allowed.  As relevant here, the policy at Upstate was not
> to allow the eye drop vials . . . to be kept in cells as they were being
> increasingly used for purposes of committing aggravated
> harassments and unhygienic acts towards staff such as spraying of
> urine and other substances.  Overtly disobeying orders also has the
> tendency to incite other inmates towards misbehavior and possible
> violence.

Hyde Decl. ¶¶ 19-21.  Flemming's disciplinary history is replete with violations for "creating

disturbances, interfer[ing] with staff, refus[ing] to follow direct orders, failure to submit to

search/frisk, violent conduct and harassment towards staff."  Hyde Decl. ¶ 23.

When an inmate refused to return unauthorized items and submit to a search, it was

within the discretion of the correctional staff to determine how to best gain the inmate's

compliance while ensuring the safety of the inmate and officers.  Hyde Decl. ¶ 24.  Because

entering the cell with physical force was inherently dangerous, DOCCS approved the use of

chemical agents to allow officers to gain entry into the cell without resorting to physical

contact.  Hyde Decl. ¶¶ 25-27.  These chemical agents, colloquially known as tear gas,

could be deployed in non emergent situations after the acquisition of medical clearance.

Waterson Decl. ¶ 16.  "[T]ear gas[] is an aerosol irritant affecting the skin and mucus

membranes and can cause tearing and uncontrolled shutting of the eyes, burning

sensations, coughing, excess nasal and mouth mucus discharge, difficulty breathing,

vomiting and prostration."  Waterson Decl. ¶ 17.  The effects "usually subside quickly after

removal of the person from the area where [the tear gas] is dispersed and decontamination

of the person."  Waterson Decl. ¶ 18.

Watertson was contacted by defendant Hyde later that morning, "seeking medical

clearance for possible use of chemical agents against inmate Flemming due to his refusal

to return the eye drops and/or submit to a search of his cell."  Waterson Decl. ¶ 15.

Waterson reviewed Flemming's medical chart and concluded that he did not have "any

serious respiratory or cardiac ailment, allergies or contact lenses that would be a

contraindication for use of chemical agents."  Waterson Decl. ¶ 19.  Waterson did note that

Flemming had mild asthma, which was treated as needed with an inhaler, but "has

consistently good oxygen saturations . . . and only one episode of wheezing in the weeks

prior . . . .," Thus, the gas would not trigger an asthma attack.  Id. ¶ 20.  Waterson's review

of Flemming's chest x-ray from April 26, 2005, which indicated an enlarged heart also

"confirmed the absence of any significant cardiac or respiratory condition . . . .," as there

were no signs of abnormality or disease.  Id. ¶ 21; see also Dkt. No. 179 at 39 (chest x-ray

from August 2006, comparing findings with April 26, 2005, showing enlarged heart but no

abnormalities or evidence of disease).  Moreover, Flemming's prescription for nitroglycerin

had also been discontinued as he had no cardiac history.  Waterson Decl. ¶ 22.  Lastly,

while Flemming had sleep apnea and used a machine at night, Waterson did not view that

as a contraindication.  Id. ¶ 23.  Therefore, Waterson determined, in his professional

judgment, that deployment of the gas "would not pose any undue health risk or substantial

risk of serious harm . . . . " Id. ¶20.  Accordingly, Waterson deemed Flemming medically

cleared.  Id. ¶ 24; Dkt. No. 178-6 at 4; Dkt. No. 179 at 9.  Administratively, defendant Kemp

was notified and approved the use of chemical agents.  Dkt. No. 178-6 at 4.

In compliance with the directive, attempts were made to contact representatives from

both ministerial services and guidance/counseling, but no staff were available on a holiday

weekend.  Hyde Decl. ¶ 30.  At approximately 10:37 a.m., Corrections Officer King began

videotaping with a handheld video camera.[9]  Dkt. No. 178-7 at 8; VHS.  Officers Canning

and Salls approached the cell and Canning gave Flemming another final and direct order to

submit to a search, but Flemming refused to comply.  Dkt. No. 178-6 at 4; DVD 2 at 10:45.

Hyde also gave approximately six orders after Canning requested Flemming's cooperation

with turning around, backing up to the cell door, and placing his hands through the feed-up

slot so that restraints could be applied and he could exit the cell.  Hyde Decl. ¶ 34; Dkt. No.

178-7 at 7; DVD 2 at 10:46-47.  Hyde also warned that chemical agents would be applied if

Flemming continued his non-compliance.  Hyde Decl. ¶ 34.

In his complaint, Flemming contends that he was lying in his bed, receiving treatment

from his machine, when Hyde administer the chemical agents into his cell, entered the cell,

and began beating him.  Second Am. Compl. at 8.  Conversely, defendants' assert that at

10:48 a.m., Hyde administered the first application, two one-second bursts, of gas through

the feed-up slot.  Hyde Decl. ¶ 36; Dkt. No. 178-6 at 1, 4; Dkt. No. 178-7 at 7; VHS at

10:48; DVD 2 at 10:47.  Flemming was then repeatedly told, and continually refused, to turn

around and place his hands through the slot.  Hyde Decl. ¶ 37; VHS at 10:48-50.  Another

application of two, one-second bursts of gas was applied through the hatch at

approximately 10:50 a.m.  Hyde Decl. ¶ 38; Dkt. No. 178-6 at 1, 4; Dkt. No. 178-7 at 7; DVD

2 at 10:49.  Altogether, Flemming was exposed to the gas for approximately seven minutes.

Hyde Decl. ¶ 42; Waterson Decl. ¶ 26..  Hyde continued to order Flemming to turn around

and place his hands through the slot, which Flemming finally did at approximately 10:52

---

[9] The hand held camera ran out of batteries prior to Flemming being returned to his cell, so those events were captured on the still cameras located in the facility.  Dkt. No. 178-7 at 8.

a.m.  Hyde Decl. ¶¶ 39-40; Dkt. No. 178-7 at 7; VHS at 10:53; DVD 2 at 10:52.  Restraints were placed on Flemming's wrists by Corrections Officer Tulip, and he and Corrections Officer Brousseau guided Flemming out of his cell.  Hyde Decl. ¶ 43; Dkt. No. 178-6 at 1; Dkt. No. 178-7 at 7, 9, 10; VHS at 10:53.  Flemming was removed from his cell at approximately 10:55 a.m., without the officers ever entering his cell.  Hyde Decl. ¶¶ 41, 43; VHS at 10:54-55; DVD 2 at 10:53-54.

Conversely, Flemming testified that multiple officers, including Palmer, Tatro, Manley, Corrigaux, and Eddy, beat and kicked him upon entering his cell.  Second. Am. Compl. at 8-9; Flemming Dep. at 25-28, 37-38.  Flemming stated that he was handcuffed in his cell, not through the feed up slot, and that he sustained injuries to his legs, ribs, and hips.  Flemming Dep. at 26-28.  The officers contend, and the video demonstrates, that at the time Flemming was restrained and removed from his cell he was not beaten, kicked, dragged, or otherwise assaulted by any of the staff.  Hyde Decl. ¶ 43; VHS at 10:54-55; DVD 2 at 10:53-54.

Flemming was then placed against the opposite wall for a pat frisk, conducted by Officer Tulip.  Hyde Decl. ¶ 44; Dkt. No. 178-7 at 10.  Flemming was then escorted to the decontamination room by Officers Tulip and Brousseau, shouting to the other inmates as he left the cell block that he "was O.K." and that "they haven't hurt [him]."  Hyde Decl. ¶¶ 44-45; Dkt. No. 178-7 at 9, 10; DVD 2 at 10:55-57.  Waterson arrived while Flemming was being escorted to decontamination.  Waterson Decl. ¶ 25.  Waterson heard Flemming stating to the other inmates in SHU that he was fine and had not been injured.  Waterson Decl. ¶ 25.  Video captured the same.  VHS at 10:55-56.  Flemming was taken immediately to the decontamination room where he was washed and his T-shirt was removed by defendant

Eddy, despite Flemming's continued declarations that he was fine and did not require a decontamination shower.  Hyde Decl. ¶¶ 47-48; Dkt. No. 178-7 at 7, 13.  This too is confirmed by video.  VHS at 10:57-58.

After decontamination, Flemming was placed in a holding area where he was maintained upright first by Officers Tulip and Brousseau, and next by Officers Rushlow and Paquin.  Hyde Decl. ¶ 49; Dkt. No. 178-7 at 7, 9-12; VHS at 10:58-59; DVD 2 at 10:58.  After Flemming's slippers were removed, a towel was placed under them so that his feet would not become cold.  Hyde Decl. ¶ 50; VHS at 11:00; DVD 2 at 10:59.  After decontamination, Waterson entered the holding cell around 11:00 a.m. to perform a visual inspection of Flemming which showed "no obvious signs of physical injury or distress."  Waterson Decl. ¶ 28; see also Dkt. No. 178-6 at 2, 3; Dkt. No. 179 at 10; VHS at 11:00; DVD 2 at 11:00.  Flemming disputes this, claiming injuries were reported to Waterson about his arms, legs, ribs, and hips and difficulty breathing, but were never recorded.  Flemming Dep. at 31-33.  Waterson returned six minutes later and took Flemming's "blood pressure (which was normal), assessed his breathing (also normal) and listened to chest sounds through a stethoscope (which were clear)."  Waterson Decl. ¶ 29; see also Dkt. No. 178-6 at 3; VHS at 11:06-07 (capturing verbal report by Waterson of Flemming's vitals); DVD 2 at 11:05-06 (same).  Flemming did complain of chest pain, but Waterson "attributed . . . [the] complaints . . . to be temporary irritation of his lungs due to exposure to the chemical agents that would resolve quickly."  Waterson Decl. ¶¶ 29, 32; see also  Dkt. No. 178-7 at 19 (inmate injury report).  Flemming did not suffer any respiratory attack or symptoms from the gas and was subsequently returned to his cell.  Waterson Decl. ¶¶ 32-33.  Flemming disagrees, contending that he was wheezing and breathing hard.  Flemming Dep. at 32-34.

11

Video does not show this, demonstrating that throughout the escort and time in the holding cell Flemming was conversing with various officers in a loud, clear voice without any indications of wheezing or shortness of breath.  Photographs were also taken of Flemming by defendant Paler and Sgt. Kourofsky.  Hyde Decl. ¶ 54; Dkt. No. 178-7 at 30-33.

Throughout the morning and during his deposition testimony, Flemming continually denied possessing unauthorized medicine and specifically his eye dropper.  Hyde Decl. ¶ 56; Flemming Dep. at 16-19, 22-23, 36.  As Flemming was waiting in the holding area, he admitted to the possession, and described to the officers the location, of the eye dropper.  Hyde Decl. ¶ 56; see also VHS at 11:11, 11:15-16 (reporting to officers that the bottle was in his lower bunk, under the green spread); DVD 2 at 11:10, 11:13-15 (same).  Flemming's cell was searched by Eddy and James and the eye dropper was recovered.  Hyde Decl. ¶ 57; Dkt. No. 178-6 at 4; Dkt. No. 178-7 at 7.  Flemming was returned to his cell at approximately 11:20 a.m. by Officers Rushlow and Paquin and he entered the cell alone and without incident.  Hyde Decl. ¶¶ 58-60; Dkt. No. 178-7 at 7, 9-12; DVD 2 at 11:20-21.

After Flemming was back in his cell, Waterson, Hyde and Sgt. Kourofsky went to see him.  Waterson Decl. ¶ 33; Hyde Decl. ¶ 61; DVD 1 at 11:26.  Flemming's only complaint was that his wrists were sore.  Waterson Decl. ¶ 34; Hyde Decl. ¶ 61.  Flemming held his wrists up so that Waterson could examine them and Waterson "saw no obvious injuries (no cuts, bleeding, swelling or redness) and also observed that he was able to move his hands and wrists freely."  Waterson Decl. ¶ 34; see also Hyde Decl. ¶ 61; DVD 1 at 11:27.  Flemming's testimony disputes this as well, claiming bruises and lacerations to his wrists due to the application of restraints.  Flemming Dep. at 46-47.  Photographs were taken.  Waterson Decl. ¶ 34; Hyde Decl. ¶ 61; Dkt. No. 178-7 at 15, 34; DVD 1 at 11:27.  Waterson

12

attributed the pain to the fact that Flemming was restrained for half-an-hour, but did not feel that further treatment was warranted.  Waterson Decl. ¶ 35.

Overall, Waterson found that Flemming tolerated the tear gas relatively well as he "was talking clearly, breathing easily without labored breaths or wheezing, was able to take deep breaths in response to my commands, seemed relaxed . . . , had no trouble seeing or complaints about his eyes, . . . and he no longer had any excessive mucus or . . . discharge."  Waterson Decl. ¶ 36.  Flemming's vitals were also stable.  Waterson Decl. ¶ 36.  There were no signs of injuries consistent with an assault.  Waterson Decl. ¶ 37.

At that point, Hyde issued a second misbehavior report charging Flemming with the failure to follow a direct order.  Hyde Decl. ¶¶ 63-64; Dkt. No. 178-7 at 18 (misbehavior report).  Additionally, the results of the cell search uncovered the location of the eye dropper bottle as well as excess law library materials.[10]  Hyde Decl. ¶ 65; Dkt. No. 178-7 at 17, 20-21 (contraband receipt).  James removed these papers from the cell, placed them on a cart, and confiscated it pending the subsequent disciplinary proceeding.  Dkt. No. 178-7 at 16-17 (misbehavior report).  While defendant James was separating the aforementioned contraband papers from those which could be properly returned to Flemming, Flemming began to use foul language towards James and threatened to have intercourse with James' wife.  Dkt. No. 178-7 at 16-17 (misbehavior report); DVD 1 at 11:37-39.  James then issued a third misbehavior report for various infractions including threats, interference, and harassment.  Dkt. No. 178-7 at 16-17 (misbehavior report).

Officers Palmer, Manley, Tatro, Corrigeux and, recently promoted, Sgt. Hebert are all

---

[10] Flemming contends that these documents and decisions were being used to challenge his criminal conviction.  Flemming Dep. at 64-67, 71-72.

named as defendants for events that allegedly occurred on September 5.  Hyde Decl. ¶ 74.

However, none were involved with the deployment of chemical agents, extraction,

decontamination, cell search, or subsequent return of Flemming.  Hyde Decl. ¶ 74.  In fact,

Manley did not begin working at Upstate until November 2005 and Tatro and Corrigeux

were on vacation on that date.  Hyde Decl. ¶ 75; Dkt. No. 178-14 at 1-2 (showing vacation

time taken on September 5 by Corrigeux and Tatro), 3 (reassignment papers for Manley

indicating employment to begin at Upstate in November).  Hebert and Palmer were

assigned to duties in other locations at Upstate on September 5.  Hyde Decl. ¶¶ 77-78; Dk.

No. 178-16 at 4-5 (showing Herbert stationed in Building 8); 6-7 (showing Palmer stationed

in Building 10).  Flemming's testimony indicates that all of these defendants were involved

in the assault, restraint, or escort of Flemming on September 5.  Flemming Dep. at 51-60.

### C.  Subsequent Medical Care

Flemming requested an examination on September 6, 2005, but when Waterson saw

Flemming he complained only of fungus on his hands and general aches and pains.

Waterson Decl. ¶ 38; Dkt. No. 179 at 10-11.  Flemming was given over-the-counter pain

relief and anti-inflammatory cream.  Waterson Decl. ¶ 38; Dkt. No. 179 at 11.  These

complaints, to Waterson, appear completely unrelated to the events which occurred on

September 5.  Waterson Decl. ¶ 39.  Flemming disagrees and testified to the fact that he

saw a medical professional the following day and was complaining about his wrist, hand,

and other injuries from the use of force.  Flemming Dep. at 48-49.

Flemming was seen again on September 8, complaining of pain in his left shoulder and

requesting Tylenol.  Dkt. No. 179 at 11.  The range of motion in Flemming's shoulder was

good, the problem deemed chronic, and pain medication was provided.  Id.  Flemming was

seen again by Waterson on September 10, 2005, requesting anti-fungal cream and

acetaminophen, both of which were issued to him.  Waterson Decl. ¶ 41; Dkt. No. 179 at

12.  On September 13, 2005, Flemming was seen by another nurse for wheezing and

shortness of breath which were both improved with use of his inhaler.  Waterson Decl. ¶ 42;

Dkt. No. 179 at 12.  These complaints were consistent with those made in August (Dkt. No.

179 at 5), related to Flemming's asthma, as opposed to "an exacerbation caused by the

chemical agents [because i]f there had been any respiratory distress related to the chemical

agents, it would have been immediate and persistent and would not have arisen for the first

time [eight] days later."  Waterson Decl. ¶ 43.

On September 23, 2005, Flemming complained of wrist pain for the first time since the

alleged use of force, but Flemming also stated "that the pain had been present since June."

Waterson Decl. ¶ 45; see also Dkt. No. 179 at 14.  X-rays of Flemming's wrists were also

taken in October 2005 and showed normal findings without evidence of any fractures or

abnormalities.  Waterson Decl. ¶ 46; Dkt. No. 179 at 22, 41.  On September 30, 2005,

Flemming also underwent x-rays of his left knee and hip which showed only degenerative

changes.  Dkt. No. 179 at 40.  Flemming also had chest x-rays again in December 2005

which continued to show normal findings.  Waterson Decl. ¶ 44; Dkt. No. 179 at 42.  On

September 30, Flemming made complaints of hip and knee pain, but reported that they

were due to a fall and not an alleged use of force.  Dkt. No. 179 at 16. Flemming contends

that o n October 16, he was involved, and sought treatment for, another use of force giving

him lower back, temple, head, and right elbow pain.  Dkt. No. 179 at 21.

## D. Disciplinary Proceedings

As a result of the three misbehavior reports Flemming received, he underwent a combined Tier III[11] hearing which concluded on October 11, 2005.  Dkt. No. 178-9.  At the conclusion of the hearing, Flemming was found guilty of all the charges except one, and was sentenced to six months confinement in SHU and six months loss of various privileges and good time credits.  Dkt. No. 178-9 at 58-59; see also Dkt. No. 178-8 at 6-7.  On November 22, 2005, the Commissioner affirmed the disciplinary disposition.  Dkt. No. 178-8 at 1.

## II. Discussion

Flemming contends (1) his First Amendment rights were violated when defendants engaged in a retaliatory transfer and denied his access to courts by removing legal papers that were in his cell and confiscated pursuant to a search; (2) his cell was searched in violation of his Fourth Amendment rights; (3) his Eighth Amendment rights were infringed when he was subjected to chemical agents given his medical history, subjected to excessive force, and forced to live in subpar conditions of confinement in SHU; and (4) his Fourteenth Amendment rights were violated when he was subjected to unconstitutional disciplinary proceedings.  Defendants move for summary judgment contending that (1) Flemming's claims other than those arising from the use of excessive force on September 5, 2005 are barred by the law of the case; (2) Flemming's use of force claim is barred by

---

[11]DOCCS regulations provide for three tiers of disciplinary hearings depending on the seriousness of the misconduct charged.  A Tier III hearing, or superintendent's hearing, is required whenever disciplinary penalties exceeding thirty days may be imposed.  N.Y. Comp. Codes R. & Regs. tit. 7, §§ 253.7(iii), 270.3(a).

res judicata; (3) Flemming's constitutional claims are meritless; and (4) defendants are entitled to qualified immunity.

## A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185,

191-92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district

courts that 'when [a] plaintiff proceeds *pro se*, ... a court is obliged to construe his pleadings

liberally.'" (citations omitted)).   However, the mere existence of some alleged factual

dispute between the parties will not defeat an otherwise properly supported motion for

summary judgment; the requirement is that there be no genuine issue of material fact.

<u>Anderson</u>, 477 U.S. at 247-48.


### B.  Law of the Case

"[W]hen a court decides upon a rule of law, that decision should continue to govern the

same issues in subsequent stages in the same case." <u>Arizona v. California</u>, 460 U.S. 605,

618 (1983) (citations omitted); <u>see</u> <u>also</u> <u>United States v. Thorn</u>, 446 F.3d 378, 383 (2d Cir.

2006) ("The law of the case doctrine counsels against revisiting our prior rulings in

subsequent stages of the same case absent cogent and compelling reasons . . . .") (internal

quotation marks and citations omitted)).   Even when cases are reassigned to a different

judge, the law of the case dictates a general practice of refusing to reopen what has been

decided." <u>Wright v. Cayan</u>, 817 F.2d 999, 1002 n.3 (2d Cir. 1987) (citations omitted).

In the present action, Flemming previously filed his First Amended Complaint alleging a

host of First, Fourth, Eighth, and Fourteenth Amendment violations.   In no uncertain terms,

the Western District ruled that the only surviving claims were Flemming's Eighth

Amendment claims occurring on September 5, 2005.   Every other constitutional claim was

dismissed with prejudice.   Furthermore, contemplation of an additional opportunity to

amend was also addressed and deemed fruitless.   As Flemming's additional allegations

regarding the other constitutional violations have already been decided, they need not be

revisit at this later stage of litigation.  Accordingly, the law of the case bars reexamination of any claims except those under the Eighth Amendment for the events of September 5.

Therefore, defendants' motion on this ground as to all claims except those under the Eighth Amendment for the events of September 5, 2005 should be granted.

### C.  Res Judicata

"Once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." Allen v. McCurry, 449 U.S. 90, 94 (1980).  "A final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." Allen, 449 U.S. at 94 (applying res judicata to a 42 U.S.C. § 1983 action).  Thus, to sustain a claim of res judicata, the defense must show that "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; and (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." Monahan v. New York City Dep't of Corr., 214 F.3d 275, 285 (2d Cir. 2000) (citations omitted).  In New York State, the analysis is governed by the transactional approach by which later claims are barred if they "aris[e] out of the same factual grouping as an earlier litigated claim even if the[y are] . . . based on different legal theories or seek[] dissimilar or additional relief." Burgos, 14 F.3d at 790 (citations omitted).

Res judicata will not apply where the original forum is incapable of providing the relief requested by the plaintiff. Burgos, 14 F.3d at 790 (citing Davidson v. Capuano, 792 F.2d 275, 278 (2d Cir. 1986)).  "Thus, where a plaintiff was precluded from recovering damages

in the initial action by formal jurisdiction or statutory barriers, not by plaintiff's choice, a subsequent action for damages will not normally be barred by res judicata even where it arises from the same factual circumstances as the initial action." Id. Even if res judicata is inapplicable to a § 1983 action because the state court forum was incapable of awarding the requested relief, it does not preclude the application of collateral estoppel. See Phifer v. City of New York, 289 F.3d 49, 56 (2d Cir. 2002).

Defendants' contend that a prior grant of a motion to dismiss in Flemming v. Goord, No. 06-CV-26 (TJM/DRH) (N.D.N.Y.) (Dkt. No. 178-17) (hereinafter "the prior action") triggers the bar of res judicata in the present case and precludes further review of the events occurring on September 5, 2005. Defs. Mem. of Law (Dkt. No. 178-22) at 16. In the prior action, Flemming's complaint identified defendants that "were not included in the voluminous incident reports submitted and relied upon by Flemming [and] Flemming did not use those reports to amend his complaint properly and to name the proper parties from the documents upon which he relied." Dkt. No. 178-7 at 7. Accordingly, since it was impossible for the court to "determine what, if anything. . . any person named in the second amended complaint allegedly did, or failed to do . . . " the motion to dismiss was granted. Id. at 8.

Flemming's prior action specifically referenced the use of force and use of chemical agents on September 5 and was dismissed with prejudice. Dkt. No. 178-17 at 8. This serves as a final adjudication on the merits. Federated Dep't Stores, Inc. v. Moitie, 452 U.S. 394, 399 n.3 (1981) ("The dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is a 'judgment on the merits.'") (citations omitted). While some of the proper defendants were named in the instant case, and none of the proper defendants were named in the prior action, the underlying nucleus of operative facts remains the same.

20

Flemming was the plaintiff in both actions.  Moreover, all named parties are related, could have, and should have been named in the prior action when the same constellation of events surrounding September 5 was initially pled.

Accordingly, defendants' motion on this ground should be granted.


### D. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment."  U.S. Const. amend. VIII.


### 1. Excessive Force

Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983.  Hudson v. McMillian, 503 U.S. 1, 9-10 (1992).  The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain."  Gregg v. Georgia, 428 U.S. 153, 173 (1976); Sims v. Artuz, 230 F.3d 14, 20 (2d Cir. 2000).  To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements.  Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999).

The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection."  Hudson, 503 U.S. at 9 (internal citations omitted); Blyden, 186 F.3d at 262.  However, "the malicious use of force to cause harm constitute[s] [an] Eighth Amendment violation per se" regardless of the seriousness of the injuries.  Blyden, 186

F.3d at 263 (citing Hudson, 503 U.S. at 9); see also Wilkins v. Gaddy, 130 S. Ct. 1175, 1178 (2010) ("The core judicial inquiry . . . was not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.").  "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind."  Hudson, 503 U.S. at 9-10 (citations omitted). "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'"  Sims, 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness."  Id. at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'"  Id. (quoting Hudson, 503 U.S. at 7).  In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "the extent of the injury and the mental state of the defendant[;] . . . the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response."  Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations omitted).

Flemming's version of events claims that numerous officers entered his cell, beat him, dragged him from his cell, beat him again, and restrained him.  Flemming's version is

untenable given the affidavits of the defendants which were fully supported by the video evidence, captured by multiple cameras throughout the facility.  The video evidence shows that Flemming was ordered by multiple individuals, on multiple occasions, to produce the eye dropper which was ultimately found in his possession.  Flemming was also ordered to turn around and place his hands out of the feed up slot so that he could be restrained and removed from his cell for a search.  This request was given dozens of times and Flemming continually failed to comply.  As the time passed, the other inmates on the tier also became agitated further compounding the potential security issues.  After a thorough medical examination and clearance, Flemming was subjected to less than eight minutes of tear gas and was removed from his cell.  The video shows that no officers entered the cell, no one beat or dragged Flemming as he left on his own accord, and as Flemming was escorted from the tier he was yelling that he was unhurt and had not been injured.  Flemming was decontaminated, again stating to officers that this was unnecessary and he was unhurt.  Flemming was visually inspected by medical, who insured and verbally reported that his vitals were stable, and photographed.  Flemming then told the officers where the contraband was located, in direct contravention of his deposition testimony, and the officers secured the contraband.  Flemming was then returned to his cell without incident.

The Supreme Court has held that

> When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt the version of the facts for purposes of ruling on a motion for summary judgment . . . Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

23

Scott v. Harris, 550 U.S. 372, 380-81 (2007).  Clear videotape evidence has been relied

upon in this Circuit, and District, to grant motions for summary judgment where the use of

force, including chemical agents, was warranted and reasonable, despite contradictory and

conclusory statements proffered by the inmate plaintiff.  See Johnson v. Woods, No. 07-

CV-1018 (DNH/DRH), 2010 WL 2039164, at *14-16 (N.D.N.Y. Mar. 2, 2010) (granting

motion for summary judgment and dismissing use of force claims for extraction and use of

chemical agents based upon defendants' submissions which were confirmed by video

evidence) (Dkt. No. 178-23 at 46-64); Green v. Morse, No. 00-CV-6533-CJS, 2009 WL

1401642 (W.D.N.Y. May 18, 2009) (granting summary judgment and dismissing use of

force claims regarding cell extraction and chemical agents based on video footage) (Dkt.

No. 178-23 at 23-37); Lipscomb v. Vann, No. 02-CV-596 (GLS/DEP) at 17 (holding that

dismissal was appropriate in an excessive force case using chemical agents where the

"written and visual accounts [via videotape] . . . are lacking in any evidence from which a

reasonable factfinder could conclude . . . that excessive force was applied to carry out the

mission of removing Lipscomb from his cell against his will.") (Dkt. No. 178-23 at 65-92).  In

this case, there is no possibility that a reasonable juror could ever believe Flemming's

recitation of the events surrounding September 5.

    Moreover, evaluating Flemming's contentions in light of the Scott factors compels a the

sameconclusion.  First, Flemming suffered no severe injury during the course of the

extraction or exposure to the chemical agents.  Flemming's complaints were of chest pain,

which Waterson attributed to the brief exposure to tear gas.  Flemming's vitals were

promptly checked after the use of chemical agents and he was determined to be stable.  He

was speaking clearly and was not wheezing or experiencing an asthma attack.  This was

further corroborated by his medical records which indicated his lungs were clear and that in the days following September 5 he was not treated for any signs or symptoms of respiratory or cardiac distress.

However, a serious injury is only a factor in the analysis.  A de minimus injury may still survive summary judgment if there was a malicious use of excessive force.  Blyden, 186 F.3d at 263; see also Wilkins, 2010 WL 596513 (2010) (granting certiorari for an Eighth Amendment case which was dismissed based upon the inmate's de minis injury without discussion or regard for the fact that "injury suffered . . . is one factor . . . [yet] it is [force] that ultimately counts," in determining whether excessive force was used).  Maliciousness is determined by the five factor test enumerated above, in Scott.  Accordingly, after applying such a test in light of the record and videos, no reasonable person could conclude that defendants' actions were malicious or wanton rather than necessary to uphold discipline and ensure safety.

The first factor militates in favor of defendants.  As previously discussed, Flemming did not suffer from sufficiently serious injuries as a result of the extraction.  The defendants' declarations and video tape all show that Flemming was agitated and yelling.

The second and fourth factors also weigh in favor of defendants.  Multiple defendants and unnamed corrections officers attempted multiple times to persuade Flemming verbally to return the eye dropper bottle or peacefully leave his cell for it to be searched. Defendants attempted to call in counsel from the ministerial or guidance services, but those individuals were unavailable probably due to the holiday weekend.  When it was clear that Flemming was not going to comply with their repeated orders, or voluntarily leave his cell, requests were made for the deployment of chemical agents so that no physical force would

be necessary to enter or restrain Flemming.  Flemming's continued non-compliance posed

a serious threat to defendants' health and safety.  As the situation progressed, it was clear

that other inmates were becoming agitated by the increased levels of yelling and noise on

the tier.

   The third factor, the amount of force used in relation to the need, also supports

defendants' motion for summary judgment.  After approximately four hours and three

separate trips by multiple officers attempting to persuade Flemming to comply, defendants

resorted to the introduction of gas into the cell.  When the gas was deployed, Flemming

remained non-compliant, yelling and refusing to follow direct orders.  When Flemming did

finally comply, no further gas was dispensed into the cell, he was restrained through the

feed up slot, immediately removed from his gas filled cell, pat frisked, and taken to the

decontamination room.

   Lastly, as previously discussed, the record undeniably shows defendants' attempts to

temper and diffuse the situation far before the suggestion of chemical agents.  Flemming's

repeated refusals indicated that he was not willing to comply with the direct orders.  This

was inciting the other inmates.  Additionally, Flemming was refusing to return his eye

dropper which led officers to be at risk for harassment and unhygienic acts.  Defendants

were charged with running a correctional facility, ensuring the health and safety of both

inmate and officers alike.  Defendants' declarations and the facility video tapes and DVDs

fail to raise any question of material fact that defendants could have pursued a different

option or that their actions were not reasonably calculated to ensure safety.

   Accordingly, defendants' motion should be granted on this ground.

26

## 2.  Use of Chemical Agents

### a.  **Excessive** Force

For the same reasons articulated supra, Johnson's allegations that the use of chemical agents was excessive force are also insufficient to raise any material issue of fact.  First, the use of chemical agents alone does not represent "malicious or sadistic" actions.  Combs v. Wilkinson, 315 F.3d 548, 557 (6th Cir. 2002) (citations omitted).  Second, the use of such chemicals did not cause any harm or pain to Flemming, as noted by his statements, vitals, and subsequent medical records.  Third, the introduction of gas was appropriate and necessary given Flemming's repeated non-compliance which had unfolded and increased throughout the hours as defendants attempted to obtain his cooperation.

### b. Deliberate Indifference

Flemming also contends that Waterson was deliberately indifferent to his medical needs, particularly his pulmonary disease, asthma, and sleep apnea, in medically clearing Flemming pursuant to the request to deploy chemical agents and his subsequent care.

The Eighth Amendment prohibition extends to the provision of medical care.  Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994).  The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious.  Farmer v. Brennan, 511 U.S. 825, 834 (1994).  Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm.  Id.  "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded

reasonably to the risk, even if the harm ultimately was not averted." Id. at 844.

"'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003)(quoting Hudson v. McMillian, 503 U.S. 1,9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." Brock v. Wright, 315 F.3d 158, 162-63 (2d Cir. 2003) (citing Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. Smith, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." Chance, 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle v. Gamble, 429 U.S. 97, 104 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. Chance, 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists . . . are not adequate grounds for a section 1983 claim." Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001).

Flemming fails to establish that Waterson was deliberately indifferent in either regard.

First, Waterson completed a detailed assessment of Flemming's medical history and current condition prior to deeming him medically fit to receive the tear gas.  Waterson contemplated his diagnoses and various radiology and test reports which indicated that Flemming had good oxygen saturations, no cardiac or respiratory conditions, abnormalities or diseases, and no general contraindications based on the treatments, including the sleep apnea machine, that Flemming was receiving.  Waterson also noted that Flemming was no longer receiving nitroglycerin, which further corroborated the absence of any cardiac concerns.  Such detailed examination and explanation of Flemming's medical conditions refutes claims of deliberate indifference, conversely showing careful inspection and consideration prior to providing the necessary medical clearance.

Further, the treatment provided to Flemming immediately after the deployment of the chemical agents also fails to demonstrate deliberate indifference.  Waterson's declaration establishes that the effects of tear gas are temporary and quickly alleviated with removal from the gassed area and decontamination.  The defendant officers immediately restrained and removed Flemming from his cell the moment he complied with their directives to turn and place his hands out of the feed up slot.  The officers also escorted Flemming directly to the decontamination room, providing him with a shower and removing his clothing despite Flemming's uncontroverted statements that he was unharmed.

Minutes after Flemming was removed from his cell, Waterson arrived to do a visual inspection and take Flemming's vitals.  Both evidence from the video and corresponding medical records indicate that Flemming's vitals were stable and his lungs were clear. Flemming did complain of chest pains, but Waterson explained that they were a temporary irritation from the gas exposure.  Such contentions are further supp0rted by the medical

records in the subsequent days which showed Flemming reporting to sick calls, but not complaining of specific pain or respiratory difficulties.  Such notations contradict claims of serious medical need.  Flemming was treated with pain medication and cream for his generalized complaints, none of which seem reasonably related to the events of September 5.  Such treatment refutes any claims of deliberate indifference.  Additionally, to the extent that there were later injuries complained of, specifically Flemming's wrist and asthma, they were immediately treated, occurred at a time too distant to be categorized as an exacerbation of any alleged injury occurring on September 5, and were attributed to other preexisting causes.

Accordingly, defendants' motion on this ground should be granted.


### E. Personal Involvement

Defendants contend that Flemming has failed to establish that Palmer, Manly, Tatro, Corrigeuz or Herber were personally involved in any of the alleged constitutional deprivations.

"'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)).  Thus, supervisory officials may not be held liable merely because they held a position of authority. Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).  However, supervisory personnel may be considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged constitutional violation;

> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).

While Flemming contends that these individuals were involved in various aspects of the events on September 5, such conclusory and unsupported claims are belied by the use of force and unusual incident reports on which Flemming relies to prove his claim.  None of these individuals were seen on the video tape, submitted memoranda for the various incident reports detailing their respective involvement, or were referenced in anyone else's submissions relating to the use of force.  Moreover, time sheets, log book entries, and reassignment paperwork indicate that (1) Manley did not begin working at Upstate until after September 2005; (2) Tatro and Corrigeux were on vacation; and (3) Palmer and Herbert were working in different buildings.  Accordingly, there exists no issue of fact that none of these defendants were directly involved in the actions on September 5.  Moreover, none of these individuals were supervisory defendants involved in training, supervising, or creating policies.  Accordingly, in the alternative, defendants' motion should be granted on this ground as to these defendants.

**F.  Meritless Constitutional Claims**

Despite the fact that the law of the case precludes review of these additional claims,

defendants argue that, in the alternative, they should still be dismissed as meritless.  Defs.

Memorandum of Law at 28-32.

**1.  Due Process**

Flemming's contentions surrounding the inadequacy of his disciplinary proceedings and

loss of privileges and good time credit are barred because of the "favorable termination"

rule of Heck v. Humphrey, 512 U.S. 477, 487-88 (1994).  That rule provides that if a

determination favorable to the plaintiff in a § 1983 action "would necessarily imply the

invalidity of his conviction or sentence," a plaintiff must prove that the conviction or

sentence has been reversed on direct appeal or declared invalid in order to recover

damages under § 1983.  This rule applies to challenges to procedures used in prison

disciplinary proceedings.  Edwards. v. Balisok, 520 U.S. 641 (1997).  There is no evidence

that Flemming's disciplinary convictions were ever vacated, overturned, or expunged.  In

fact, supporting documentation indicates they were expressly affirmed.   Thus, the Heck

rule still applies and any procedural challenges are barred.  Because Flemming's recovery

of damages here for faulty hearing procedures and his requested relief would necessarily

imply the invalidity of his disciplinary convictions, the requested relief based on that hearing

is barred.

32

## 2.  Destruction of Property

Any claims Flemming has made regarding destruction of his property during a cell search also fail to state an actionable claim.  An inmate has a right not to be deprived of property without due process.  However, federal courts do not provide redress for the deprivation of property if there is an adequate state court remedy which the plaintiff can pursue.  Hudson v. Palmer, 468 U.S. 517, 533 (1984).  "An Article 78 proceeding permits a petitioner to submit affidavits and other written evidence, and where a material issue of fact is raised, have a trial of the disputed issue, including constitutional claims."  Locurto v. Safir, 264 F.3d 154, 174 (2d Cir. 2001) (citations omitted); see also N.Y. C.P.L.R. §§ 7803, 7804; Campo v. New York City Employees' Ret. Sys., 843 F.2d 96, 101 (2d Cir. 1988) ("Article 78 . . . provides a summary proceeding which can be used to review administrative decisions.").  State law also provides that "[a]ny claim for damages arising out of any act done . . . within the scope of . . . employment and in the discharge of the duties of any officer or employee of the department [of corrections] shall be brought and maintained in the court of claims as a claim against the state."  N.Y. Corr. Law § 24(2).

Such claims fail as a matter of law for at least two reasons.  First, the Article 78[12] procedure exists and affords an adequate state court remedy.  Second, because Flemming is suing for damages, he must pursue his claims here against New York State in the New York Court of Claims pursuant to Corrections Law § 24.  Thus, the correct venue to litigate these claims is in state court.  Accordingly, defendants' motion should be granted as to this claim.

---

[12]N.Y. C.P.L.R. art. 78 establishes the procedure for judicial review of the actions and inactions of state and local government agencies and officials.

### 3.  Cell Searches

To the extent that Flemming claims a Fourth Amendment deprivation, such claims are

meritless.  The Fourth Amendment does not protect against searches and seizures of

prison cells where the contraband and legal work here was kept.  Hudson v. Palmer, 468

U.S. 517, 527-28 (1984).


### 4.  Confiscation of Legal Work

Flemming contends that defendants confiscated legal work in connection with his

appeal of his conviction.  In order to state a claim of denial of access to the courts a plaintiff

must allege "that a defendant caused 'actual injury,' i.e. took or was responsible for actions

that 'hindered [a plaintiff's] efforts to pursue a legal claim.'"  Id. (citing Monsky v. Moraghan,

127 F.3d 243, 247 (2d Cir. 1997) (quoting Lewis v. Casey, 518 U.S. 343, 351 (1996)).

Even viewing the facts in the light most favorable to Flemming, he has failed to

establish any actual injury.  First, with regard to Flemming's direct appeal, he testified that

he was represented by counsel, but still wanted to submit his own papers, which he was

able to submit successfully.  Flemming Dep. at 63-68.  These papers included three legal

arguments from his attorney and eleven from Flemming, and were filed in June and July

2005 respectively, both prior to the alleged confiscation.  Flemming v. New York, No. 06-

CV-15226(RJH)(HBP), 2009 WL 6325520, at *4 (S.D.N.Y. Aug. 10, 2009) (Dkt. No. 178-20

at 6).  This direct appeal was denied, as was the subsequent application for leave to

appeal.  Id. at *5 (Dkt. No. 178-20 at 7).

Flemming then filed papers for a habeas corpus action in the New York Appellate

Division, First Department on September 1, 2006, subsequent to the alleged confiscation. Flemming v. New York, 2009 WL 6325520, at *6 (Dkt. No. 178-20 at 8).  The court's opinion stated that it allowed Flemming to file an amended petition, which he did, "on or about February 7, 2007, asserting over fifty purported claims for relief."  Id.  The court went on to issue a twenty-six page decision which addressed every claim Flemming proffered.  Such submissions refute any claims that paperwork which was taken from the cell produced an actual injury.  It is clear from the court's decision that Flemming was able to adequately, though ultimately unsuccessfully, pursue his legal claims.  Accordingly, defendants' motion should be granted on this ground.

### 5. Retaliation

To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff.  Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996); see also Lipton v. County of Orange, 315 F. Supp. 2d 434, 447-48 (S.D.N.Y. 2004) (applying First Amendment retaliation factors to a pretrial detainee complaint).  Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration.  Jackson v. Onondaga County, 549 F. Supp. 2d 204, 214-15.  Conclusory allegations alone are insufficient.  Id. at 214 (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983) (explaining that "claim[s] supported by specific and detailed factual allegations . . . ought usually be pursued with full discovery.")).

In this case, Flemming has failed to allege facts sufficient to support a retaliation claim. While filing grievances and lawsuits are actions protected by the First Amendment,

Flemming has failed specifically to alleged who he filed grievances and lawsuits against and when they were filed.  Flemming has failed to allege any facts to establish that defendants' adverse actions were motivated by, or temporally related to, any constitutionally protected conduct.  Thus, all Flemming has proffered are conclusory allegations to demonstrate that he was the victim of retaliatory conduct.  These conclusory allegations, without more, are insufficient to maintain the present claims.  Id.

Accordingly, defendants' motion should be granted as to these claims.


## G. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity.  Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F. Supp. 2d 211, 229-30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003).  However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those rights."  Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  Only if there is a constitutional violation does a court proceed to determine whether the constitutional

rights were clearly established at the time of the alleged violation. <u>Aiken</u>, 236 F. Supp. 2d at 230. Here, the second prong of the inquiry need not be reached because, as discussed <u>supra</u>, it has not been shown that defendants violated Flemming's constitutional rights.

Therefore, it is recommended in the alternative that defendants' motion on this ground be granted.


### III.  Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that:

1.  Defendants' motion for summary judgment (Dkt. No. 178) be **GRANTED** as to all moving defendants and all claims;

2.  Flemming's cross-motion for summary judgment (Dkt. No. 183) be **DENIED**; and

3. The Second Amended Complaint be **DISMISSED** without prejudice as to defendant Eddy.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the . . . recommendation." N.Y.N.D.L.R. 72.1(c) (citing 28 U.S.C. §636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** <u>Roldan v. Racette</u>, 984 F.2d 85, 89 (2d Cir. 1993); <u>Small v. Sec'y of HHS</u>, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated:  August 30, 2012
        Albany, New York

_David R. Homer_

United States Magistrate Judge

37